1
2
3
4
5
6
7
8            UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10                 EASTERN DIVISION

11   KENNETH TRUEX,                    )
                                       )
12              Plaintiff,             )    Case No. EDCV 09-2006 AJW
                                       )
13        v.                           )    MEMORANDUM OF DECISION
                                       )
14   MICHAEL J. ASTRUE,                )
     Commissioner of the Social        )
15   Security Administration,          )
                                       )
16              Defendant.             )
     _____)
17
18        Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the

19   Social Security Administration (the "Commissioner"), denying plaintiff's application for supplemental

20   security income benefits.  The parties have filed a Joint Stipulation ("JS") setting forth their contentions with

     respect to each disputed issue.
21

22                          Administrative Proceedings

23        The procedural facts are summarized in the Joint Stipulation. [JS 2]. In an April 21, 2009 hearing

24   decision that constitutes the Commissioner's final decision in this matter, an administrative law judge

     ("ALJ") found that plaintiff had severe impairments consisting of cardiomyopathy, obesity, and
25

26   hypertension, but that he retained the residual functional capacity ("RFC") to perform sedentary work in a

27   clean air environment that did not involve working at unprotected heights or temperature extremes.

28   [Administrative Record ("AR") 14]. The ALJ concluded that plaintiff was not disabled because his RFC did

1  not preclude him from performing work available in significant numbers in the national economy. [AR 17-

2  18].

3                                    **Standard of Review**

4          The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial

5  evidence or is based on legal error. Stout v. Comm'r, Social Sec. Admin., 454 F.3d 1050, 1054 (9th Cir.

6  2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).  "Substantial evidence" means "more than

7  a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir.

8  2005).  "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

9  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)(internal quotation marks omitted). The court is

10 required to review the record as a whole and to consider evidence detracting from the decision as well as

11 evidence supporting the decision.  Robbins v. Social Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006);

12 Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than

13 one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

14 Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Social Sec. Admin., 169 F.3d 595, 599 (9th

15 Cir.1999)).

16    **Duty to develop the record**

17         Plaintiff contends that the ALJ erred in failing adequately to explore relevant facts and develop the

18 record. [JS 3-19, 37-38].

19         The ALJ is not "'a mere umpire' during disability proceedings. Rather, the ALJ has 'a special duty

20 to fully and fairly develop the record and to assure that the claimant's interests are considered.'" Widmark

21 v. Barnhart, 454 F.3d 1063, 1068 (9th Cir.  2006)(quoting Higbee v. Sullivan, 975 F.2d 558, 561 (9th Cir.

22 1992)(per curiam) and Brown v. Heckler, 713 F.2d 441, 443 (9th Cir.1983)). When a claimant is not

23 represented by counsel, "it is incumbent upon the ALJ to scrupulously and conscientiously probe into,

24 inquire of, and explore for all relevant facts.  The ALJ must be especially diligent in ensuring that favorable

25 as well as unfavorable facts and circumstances are elicited."  Vidal v. Harris, 637 F.2d 710, 713 (9th Cir.

26 1981)(quoting Cox v. Califano, 587 F.2d 988, 991 (9th Cir. 1978)). "Lack of counsel does not affect the

27 validity of the hearing and hence warrant remand, unless the claimant can demonstrate prejudice or

28 unfairness in the administrative proceedings." Vidal, 637 F.2d at 713.

1    Plaintiff appeared for the hearing without a representative.  A social security disability claimant has

2    a "statutory right, which may be waived, to be represented by counsel before an ALJ," Graham v. Apfel, 129

3    F.3d 1420, 1422 (11th Cir. 1997) (per curiam) or, alternatively, to be represented by a non-attorney. See 20

4    C.F.R. §§ 404.949-.950, 416.1449-.1450.  Plaintiff signed an acknowledgment of receipt of a hearing notice,

5    which advised him of his right to representation.  [AR 37, 41, 63-83].  The ALJ did not ask plaintiff any

6    questions during the hearing to ascertain if he had knowingly waived his statutory right to representation,

7    "[b]ut the issue is not whether the right to representation was knowingly waived, it is whether, in the absence

8    of representation, the administrative law judge met the heavy burden imposed by Cox . . . ."  Vidal, 637

9    F.2d at 714.

10    Plaintiff argues that the ALJ did not meet his burden to explore for all relevant facts and develop the

11    record.  Specifically, plaintiff contends that the ALJ erred in failing to obtain updated treatment reports,

12    failing to elicit any evidence about plaintiff's activities, and failing adequately to inquire about the combined

13    effects of plaintiff's heart problems, medications, obesity, sleep apnea, and documented subjective

14    symptoms on his ability to work.

15    The record contains plaintiff's treatment records from April 30, 2007 through September 24, 2007,

16    a period of less than five months. [AR 132-148, 157-176].  Plaintiff was admitted to Arrowhead Regional

17    Medical Center ("ARMC") after seeking emergency room treatment on April 30, 2007 for a one-week

18    history palpitations, shortness of breath, and chest pressure.  [AR 143].  His admitting diagnoses were

19    "[r]ecurrence of atrial flutter with rapid ventrical response secondary to noncompliance with medications";

20    history of atrial flutter status post transesophageal echocardiogram ("TEE")[1] and cardioversion[2];

---

22    [1]    A standard (transthoracic) echocardiogram uses high-frequency sound waves to produce a
23    graphic outline of the heart's movement. Views of the heart are obtained by moving a transducer,
      which resembles a microphone, to different locations on the chest or abdominal wall. The transducer
      sends sound waves into the chest and picks up echoes reflecting off different parts of the heart.
24         In a TEE, the ultrasound transducer is positioned on an endoscope and is guided down the
25    patient's throat into the esophagus. The TEE test provides a view of the heart's valves and chambers,
      without interference from the ribs or lungs. See Cleveland Clinic website,
26    http://my.clevelandclinic.org/services/echocardiogram/hic_transthoracic_echocardiogram_tte.aspx
      and http://my.clevelandclinic.org/heart/services/tests/ultrasound/tee.aspx (last visited Dec. 27, 2010).

27    [2]    Cardioversion
28

hypertension; left ventricular systolic dysfunction; and dilated cardiomyopathy. [AR 141, 145].

An attending physician noted that plaintiff had a history of congestive heart failure and hypertension, and that he had undergone TEE and cardioversion in December 2004, that is, prior to his alleged date of onset of disability. [AR 144].   The attending physician also commented that plaintiff "has been noncompliant with his medications and as such has not been on any medications in the recent past. . . . The patient has been off medications for the past year as the patient states that he ran out of medications." [AR 144].

During his inpatient stay, plaintiff was administered several medications. [AR 144].  Plaintiff also was

> offered TEE and cardioversion but he refused.  The potential risks and benefits of the cardioversion and TEE were fully explained to the patient.   The patient opted for medical treatment option that is to include heart rate control with medications including Cardizem and metoprolol. [¶]  The patient has been started on anticoagulation treatment with Coumadin, which should be continued.  Strict adherence to medications has been recommended.

[AR 145].  Plaintiff was advised to follow up with his primary care physician on a regular basis and to utilize the Cardiology Clinic if needed. [AR 145].

A transthoracic echocardiography report dated May 2, 2007 showed moderate mitral regurgitation, mild tricuspid regurgitation, mildly dilated left atrium, moderately severe left ventricular hypertrophy, and moderate to severe decreased left ventricular ejection fraction. [AR 139-140].  The following day, plaintiff

---

is a procedure in which an electrical shock is delivered to the heart to convert an irregular or fast heart rhythm (called an arrhythmia) to a normal heart rhythm. During cardioversion, your doctor uses a cardioverter machine to send electrical energy (or a "shock") to the heart muscle to restore the normal heart rhythm. [¶] Cardioversion can be used to treat many types of fast or irregular heart rhythms. The most common irregular heart rhythms that require cardioversion include atrial fibrillation and atrial flutter.

Cleveland Clinic website, http://my.clevelandclinic.org/heart/services/tests/procedures/cversion.aspx (last visited Dec. 27, 2010).

was discharged home with diagnoses of atrial flutter with rapid ventricular response, resolved; history of congestive heart failure; dilated cardiomyopathy, stable; and hypertension, under control. [AR 138]. He was prescribed Lasix (forusemide)[3]; Cardizem (diltiazem)[4]; Lovenox (enoxaparin injection)[5], Vasotec (enalapril)[6], metoprolol[7], Zocor (simvastatin)[8], Coumadin (warfarin)[9], and aspirin. He was instructed to take his medications regularly as directed, and to follow up at the "Coumadin Clinic." [AR 138].

Plaintiff followed up at the ARMC Anticoagulant Clinic on May 14, 2007 and May, 30, 2007. [AR 136, 170]. He was educated about drug and food interactions with Coumadin.  He was told to monitor himself for bleeding and bruising and to seek medical attention "if severe bleeding occurs." [AR 170]. His

---

[3]    Lasix is used to reduce swelling and fluid retention caused by various medical conditions, including heart disease, and is also used to treat high blood pressure. See PubMed Health website, U.S. National Library of Medicine, National Institutes of Health, at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000791 (last visited Dec. 27, 2010).

[4]    Cardizem is used to treat high blood presuure and angina. See PubMed Health website, U.S. National Library of Medicine, National Institutes of Health, at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000815 (last visited Dec. 27, 2010).

[5]    Lovenox is used, among other things, in combination with aspirin to prevent complications from angina and heart attacks. See PubMed Health website, U.S. National Library of Medicine, National Institutes of Health, at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000158 (last visited Dec. 27, 2010).

[6]    Vasotec is used alone or in combination with other medications to treat high blood pressure and heart failure. See PubMed Health website, U.S. National Library of Medicine, National Institutes of Health, at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000865 (last visited Dec. 27, 2010).

[7]    Metoprolol (brand name Lopressor or Toprol) is used alone or in combination with other medications to treat high blood pressure, prevent angina, and to improve survival after a heart attack. See PubMed Health website, U.S. National Library of Medicine, National Institutes of Health, at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000795 (last visited Dec. 27, 2010).

[8]    Zocor, a statin drug,  is used together with lifestyle changes to lower cholesterol.  See PubMed Health website, U.S. National Library of Medicine, National Institutes of Health, at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000911 (last visited Dec. 27, 2010).

[9]    Coumadin is used to prevent blood clots from forming or growing larger in the blood and blood vessels.  It is prescribed for certain types of irregular heartbeat, people with prosthetic heart valves, and heart attack victims. See PubMed Health website, U.S. National Library of Medicine, National Institutes of Health, at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000634 (last visited Dec. 27, 2010).

Coumadin dosage was increased on the first visit, but was not altered on the second visit. He was instructed to return on June 12, 2007, but the record does not contain any further progress notes from the Anticoagulant Clinic. [AR 136].

Plaintiff reported to the ARMC emergency room on June 4, 2007 complaining of weakness, headache, blurry  vision, and shortness of breath. [AR 133].  He reported that he had not taken his medications other than Coumadin for two days. [AR 133].  The impression was "Uncontrolled HTN (hypertension) Urgency Noncompliance" and "A fib" (atrial fibrillation).  A chest x-ray was negative. [AR 134].  Plaintiff was given medication and discharged home the same day in "good" condition. [AR 132].

Plaintiff returned to the ARMC emergency room on August 11, 2007 complaining of bilateral leg edema for the past week, shortness of breath on exertion, and paroxysmal nocturnal dyspnea (shortness of breath while sleeping).  [AR 167]. He said that he was taking his medications as directed.  He was treated Lasix, and his prescription Lasix dosage was increased. [AR 166-167]. He was discharged "feeling well" in "stable" condition, with instructions not to consume salt or fast food and to follow up with the Family Health Center in a week. [AR 166].

Plaintiff returned to the emergency room less than two weeks later for recurring bilateral lower extremity swelling.  He said that the increased Lasix dosage helped initially, but that the swelling had returned.  His Lasix dosage was increased again, a new medication was prescribed, his prescriptions were refilled as needed, and he was instructed to adhere to a low sodium diet.  His hypertension was noted to be under "improving control." [AR 158-159]. He was instructed to return for follow-up pending laboratory test results. [AR 158].

The record also contains a letter dated December 18, 2008 from Marilyn Gove, a nurse practitioner at ARMC.  Ms. Gove wrote that plaintiff was a patient at Arrowhead Fontana Area Family Health Center ("Fontana Health Center") and

has a history of myocardial infarction, atrial flutter with rapid ventricular response rate, associated congestive heart failure, dilated cardiomyopathy 2005, moderate to severe left ventricular hypertrophy 10/2008, obstructive sleep apnea 10/2008, hyperlipidimia and hypertension. . . . [¶] [Plaintiff] has had several admissions to the hospital over the past few years secondary to his illnesses.  He also had a history of exertional dyspnea.

[AR 130]. Ms. Gove summarized the results of plaintiff's May 2, 2007 echocardiogram and noted that plaintiff had undergone a TEE in December 2004 showing an ejection fraction of 30%. [AR 130].

Plaintiff has the burden of producing evidence of disability. Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001)(citing 42 U.S.C. § 423(d)(5)); see 20 C.F.R. § 404.1512(a),(c). "An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." Mayes, 276 F.3d at 459-460 (citing Tonpetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001)). When the ALJ's duty to "conduct an appropriate inquiry" is triggered, the ALJ "may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." Tonapetyan, 242 F.3d at 1150 (citing Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir.1998); Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996)).

In the circumstances of this case, the record was ambiguous and inadequate to support the determination of nondisability, and the ALJ did not meet his "heavy burden" to elicit favorable as well as unfavorable facts in the absence of counsel.

First, notwithstanding the absence of counsel and Ms. Gove's letter, the ALJ did not request or obtain treating source records for the period after September 2007. Plaintiff listed the Fontana Health Center and ARMC as his treating sources in his disability reports. [AR 106-107, 115-116]. The Social Security Administration made requests to those facilities for plaintiff's records in July 2007 and September 2007. [AR 131, 156, 165]. Records were submitted for the period from May 2007 through September 2007. [See AR 131-148,156-176].

The two nonexamining state agency physicians who reviewed plaintiff's file did so on August 3, 2007 (Dr. Brodsky) and October 16, 2007 (Dr. Bitonte). [AR 154-155, 177-179]. Dr. Brodsky had before him plaintiff's records from May 2007 and June 2007 only. [See AR 154-155]. Despite these relatively few records and his finding that "long-term noncompliance has been an issue," Dr. Brodsky found that a "severe MDI [medically determinable impairment] is clearly documented" and was severe enough to limit plaintiff to sedentary work. [AR 155]. After reviewing plaintiff's medical records from August 2007 and September 2007, Dr. Bitonte concluded that "there is no objective data compromising the RFC dated 8-3-07," and therefore he affirmed the assessment of a sedentary RFC. [AR 177-178].

1    Ms. Gove's letter was dated December 19, 2008, some fifteen months after the date of the medical

2    records reviewed by the nonexamining state agency doctors.  Plaintiff testified that he saw Ms. Gove "every

3    time" he went to the clinic, and that he had clinic appointments about once or twice a month. [AR 29-30].

4    Plaintiff also stated in his testimony and disability reports that he was currently taking several medications,

5    including Coumadin, Lopressor, Lasix, and Vasotec. [AR 25, 117]. Ms. Gove referenced conditions with

6    dates in 2005 and October 2008, as well as a new condition—obstructive sleep apnea— that was not

7    reflected in plaintiff's prior medical records. She also said that plaintiff had "several" hospital admissions

8    due to his conditions. [AR 130].

9    Notwithstanding plaintiff's testimony and Ms. Gove's statements indicating that plaintiff had been

10   in ongoing treatment, nothing in the record indicates that the ALJ attempted to obtain updated treatment

11   records (or gave plaintiff the opportunity to submit them).  Nor did the ALJ order a consultative

12   examination.  Instead, he relied on the state agency physicians' opinions, as well as on "the paucity of

13   medical treatment for [plaintiff's] alleged impairments, the lack of objective findings and noncompliance

14   with prescribed medication" to find that plaintiff's impairments did not meet or equal a listed impairment,

15   and that plaintiff retained a sedentary RFC that did not preclude performance of jobs available in significant

16   numbers in the national economy. [AR 16].  Confronted with testimonial and documentary evidence that

17   plaintiff was receiving ongoing treatment for his severe impairments and was currently taking multiple

18   medications, the ALJ erred in relying solely on the nonexamining physicians' opinions, the lack of treatment

19   records or objective findings, and plaintiff's prior history of noncompliance without first attempting to

20   obtain plaintiff's updated treating source records. Cf. McLeod v. Astrue, — F.3d —, 2010 WL 5132007,

21   at *2 (9th Cir. Dec. 16, 2010) (rejecting the argument that the ALJ did not adequately develop the record

22   by failing to request more explanation from the claimant's treating physicians where "[i]t appears from the

23   record that substantially all of their medical records throughout the time they treated [the claimant] were

24   before the ALJ").

25   Second, the ALJ erred because he made no attempt to elicit evidence regarding plaintiff's daily

26   activities, yet he discounted plaintiff's credibility in part because he was not "forthcoming" about his daily

27   activities. [AR 15]. Ordinarily the record includes at least one daily activities questionnaire, and frequently

28   a pain questionnaire and a third party function report as well.  Those questionnaires were absent from this

record, an omission that should have alerted the ALJ to the need to elicit testimony from plaintiff on that topic.

The ALJ did not do so. During the hearing, the ALJ examined plaintiff about his legal history, work history, living situation, family (including his parents' and brothers' employment), and earnings in some detail. [See AR 23-25, 26, 28-29]. The ALJ concluded that plaintiff's testimony on those issues reflected negatively on his credibility. [AR 15]. The ALJ questioned plaintiff briefly about why he could not work, his medications and their side effects, and his treatment, with few follow-up questions to elicit additional details. [AR 25-26, 28, 29-31]. The ALJ did *not* ask plaintiff to describe what he did during the day or any other questions about his daily activities. Nonetheless, the ALJ found that plaintiff was "not forthcoming about his activities of daily living," citing plaintiff's testimony "that he helps his mother most of the day," which "is inconsistent with his statement that his mother works full-time." [AR 15]. Plaintiff testified that his mother worked at an automobile auction as a "carpooler" for "the transporters," and that his *brothers* were "helping out my mom as much as, you know, they can at the auction." [AR 28-29]. Plaintiff did not testify that he helped his mother, much less for "most of the day." [AR 15].

Given plaintiff's unrepresented status, the absence of plaintiff's updated treating source records, and the lack of evidence illuminating his activities of daily living, there is a "substantial likelihood of prejudice" from the failure to further develop the record, and therefore "remand is appropriate." McLeod, — F.3d at —, 2010 WL 5132007, at *5. On remand, the ALJ is directed to conduct a new hearing and take such other steps as are necessary to ensure a full and complete record, and to issue a new hearing decision containing appropriate findings. See Tonapetyan, 242 F.3d at 1151 (remanding for further development of the record and "for further appropriate proceedings in light of that additional development").[10]

///

---

[10]    This disposition makes it unnecessary to address plaintiff's additional contentions that: (1) the ALJ failed properly to consider whether plaintiff's condition met a listed impairment; (2) the ALJ did not properly consider the effects of plaintiff's obesity in light of his heart conditions; (3) the ALJ did not properly consider the medical evidence; (4) the ALJ did not properly consider plaintiff's long-term use of anti-coagulants in assessing plaintiff's RFC; and (5) the ALJ erred in assessing plaintiff's credibility. None of those contentions warrants relief greater than a remand for further administrative proceedings because, even if plaintiff prevailed on those arguments, outstanding issues remain to be resolved before a disability determination can be reached.

1

**Conclusion**

2      The Commissioner's decision is not supported by substantial evidence and is not free of legal error.

3  Accordingly, the Commissioner's decision is reversed, and the case is remanded to the Commissioner for

4  further administrative proceedings consistent with this memorandum of decision.

5  **IT IS SO ORDERED.**

6

7  December 29, 2010

8

9

10  _____
    ANDREW J. WISTRICH
    United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28